DENVER FIRE INSURANCE COMPANY V. McCLELLAND.

1. In an action against a corporation the plea of *ultra vires* is not to be understood as an absolute and peremptory defense in all cases of excess of power without regard to other circumstances and considerations. The plea is not to be entertained when its allowance will do great wrong to innocent third persons.

2. If a private corporation has accepted and retained the full benefit of a contract which it had no power to make, the same having been fully performed by the other party thereto, and if the transaction is of such a nature that the party thus performing will suffer manifest hardship and injustice, unless permitted to maintain his action directly upon the contract, no other adequate relief being at his command, the defense of *ultra vires* may be disallowed.

BECK, C. J., and HELM, J., concurring specially.

*Appeal from District Court of Larimer County.*

THE facts are stated in the opinion.

Messrs. STALLCUP, LUTHE and SHAFFROTH and TELLER and ORAHOOD, for appellant.

Messrs. NORVILLE and CLARK and T. M. ROBINSON, for appellee.

STONE, J.    The sole question in this case is whether the appellant can avail itself of the *ultra vires* of the contract upon which its liability, if any, arises as a defense to the action.    The complaint of appellee, the plaintiff below, is as follows:

Plaintiff states that .the defendant is a corporation duly organized and incorporated under the laws of the state of Colorado, and doing business in Larimer county in the state of Colorado as a general fire and hail insurance company.

"Plaintiff, for cause of action, states: 1. That on or about the 12th day of June, 1882, plaintiff was the owner of certain growing crops, situate on the east half of the northeast quarter and the north half of the southeast half of section 2, township 6, range 69 west, and southwest quarter section 35, township 7, range 69 west, in Larimer county, state of Colorado.

"2. That on said 12th day of June, 1882, the defendant in its said capacity of an insurance company contracted and agreed with plaintiff for and in consideration of the sum of $61.03, $3 of which said sum was then and there paid by plaintiff to defendant, and the balance of which

said sum, amounting to $58.03, was then and there evidenced by a promissory note made due and payable on the 1st day of November, 1882, executed and delivered by plaintiff to defendant, and by defendant accepted, to insure the plaintiff in the sum of $1,935 against loss or damage to the aforesaid growing crop by reason of injury to or destruction thereof by hail, and did then and there by its certain policy of insurance dated on the said 12th day of June, 1882, duly signed by Archie C. Fisk, its president, and R. P. Goddard, its secretary, and countersigned by Jesse Harris, its duly authorized agent, and by defendant delivered to plaintiff, insure plaintiff for the term of one year from the date of said policy against loss or damage to his said growing crops by reason of the destruction thereof or any injury thereto that might be caused by hail, and did by the terms and stipulations contained in said policy, and for and in consideration of the said sum of $61.03, promise and agree to make good unto the plaintiff all such immediate loss or damage as might occur by reason of hail to the aforesaid growing crops from the said 12th day of June, 1882, to the 12th day of June, 1883, in the sum of $1,935, to be paid sixty days after due notice and proof of such loss or damage.

" 3. That said insurance covered and applied to plaintiff's said growing crops as follows, to wit:   On sixty-five acres of wheat not to exceed, in case of loss, $15 per acre, or $975.   On six acres of oats not to exceed, in case of loss, $15 per acre, or $90.   On one hundred and twenty acres of wheat, not to exceed, in case of loss, $6 per acre, or $720.   On one acre of strawberries, not to exceed, in case of loss, $150 per acre.

" 4. That by the terms and conditions of said policy of insurance, the defendant contracted and agreed that in the event of injury, loss or damage to plaintiff's said growing crops or any part thereof, not amounting to a total destruction thereof, such damage or injury should be appraised by disinterested and competent persons to be

mutually agreed upon by plaintiff and defendant, unless the amount of such damages should be agreed upon between the plaintiff and defendant.

"5. That on the 19th day of June, 1882, plaintiff's said growing crops were injured and damaged by hail to the amount of $1,500, and the plaintiff sustained damage and loss thereby in respect of his said growing crops in the said sum of $1,500.

"6. That on the 19th day of June, 1882, plaintiff gave defendant due notice of plaintiff's said loss and damage.

"7. That on the 22d day of June, 1882, plaintiff rendered to defendant a particular account of said loss and damage verified by the affidavit of plaintiff.

"8. That said crops not being totally destroyed by said hail, and the plaintiff and defendant not being able to agree upon the amount of said damages so sustained by plaintiff, the plaintiff and defendant mutually agreed upon W. F. Watrous and Charles Warren, two disinterested and competent persons, as appraisers to assess and appraise the amount of damages and loss so sustained by plaintiff.

"9. That the said W. F. Watrous and Charles Warren did then and there, on the 22d day of June, 1882, appraise the damage and injury to plaintiff's said crops caused by the injury thereto by hail as aforesaid at the sum of $1,500 as follows, to wit:

"'To plaintiffs said sixty-five acres of wheat hereinbefore mentioned as insured for $975, said appraisers assessed and appraised the damages at the sum of $780. To plaintiff's said six acres of oats hereinbefore mentioned as insured at and for $90, said appraisers assessed and appraised the damages at $90. To plaintiff's said one hundred and twenty acres of wheat hereinbefore mentioned as insured for $720, said appraisers assessed and appraised the damages at $480; and to plaintiff's said one acre of strawberries hereinbefore mentioned as insured for $150, said appraisers assessed and appraised the

damages at $150; which said appraisement represented the true damage and injury done to plaintiff's said growing crops by said hail.'

"10. That said appraisers, on the 22d day of June, 1882, made out and delivered to defendant a statement or report in writing, verified by their affidavits, setting out in detail their said appraisement of the damages aforesaid as herein averred and set forth.

"11. That more than sixty days have elapsed since the aforesaid notice and proof of plaintiff's loss and damage were received by defendant at its office, and that defendant has wholly failed, neglected and refused to pay plaintiff the said sum of $1,500, or any part thereof, and has failed and refused to make good or pay plaintiff for his said loss and damage, or any part thereof.

"Wherefore plaintiff prays judgment for $1,500, together with interest and costs of suit, and for general relief."

The amended answer of the appellant company, the defendant below, "denies that on the 19th day of June, 1882, or at any other time, plaintiff's growing crops were injured or damaged by hail to the amount of $1,500, or any other amount, or that plaintiff sustained damage or loss thereby in respect of his growing crops in the said sum of $1,500, or any other sum.

"Denies that the plaintiff and defendant mutually agreed upon W F. Watrous and Charles Warren, or either of them, or any other person or persons, as appraisers to assess or appraise the amount of damage or loss so pretended to be sustained by plaintiff, or that said pretended appraisers acted by any authority whatever, but avers that all and each part of said pretended appraisement, and each and every act of said pretended appraisers in the behalf mentioned in said complaint, were without authority, irregular, illegal and void.

"Defendant for a second and separate defense to the complaint herein states that it is a corporation duly in-

corporated under and by virtue of the laws of the state of Colorado, and doing business in said county of Larimer; * * * that said articles of incorporation have never been amended; that said articles of incorporation were duly filed and recorded in the office of the secretary of state of Colorado on the 26th day of August, A. D. 1881, and were duly filed and recorded in the office of the county clerk and recorder in and for said Larimer county long before the 12th day of June, A. D. 1882, and long before the alleged contract between plaintiff and defendant was made.

"Defendant further states that, by virtue of said articles of incorporation, neither the said The Denver Fire Insurance Company, its directors, stockholders or officers, had or have any right, power or authority to enter into or make any contracts with plaintiff or any one by which said company could insure growing crops of any kind against loss or damage by hail, but that all and each of the several acts of the said The Denver Fire Insurance Company, its directors, stockholders and officers, which are alleged and set forth in the complaint herein in reference to the making of said alleged contract with plaintiff, and to the insurance and making of the alleged policy of insurance to plaintiff, and all other acts with reference to the terms of the said policy, the alleged agreement to arbitrate any loss of plaintiff, and the alleged appointment and finding and appraisement of said alleged arbitrators, are absolutely null and void, each and every act being beyond the scope and power vested by the said articles of incorporation in defendant, its directors, stockholders and officers.

"Defendant further states that it is willing to return all that it has received from plaintiff by reason of said alleged policy of insurance, to wit, $3, and plaintiff's said promissory note for $58.03. Wherefore defendant asks to be discharged with costs."

The articles of incorporation are set out in full in the

foregoing answer, that portion which is material to the question before us being as follows:

"Know all men by these presents, that we, Archie C. Fisk, Samuel S. Griswold and Frederick Michel, residents of the state of Colorado, have associated ourselves together under the name and style of The Denver Fire Insurance Company, for the purpose of becoming a body corporate and politic, under and by virtue of the laws of the state of Colorado, and in accordance with the laws of the said state.   We hereby make, and execute, and acknowledge three hundred original certificates, in writing, of our intention to become a body corporate under and by virtue of said laws.

"1. The corporate name and style shall be The Denver Fire Insurance Company.

"2. The objects for which this company is formed are to become a body corporate and politic, with power to sue and be sued, to insure buildings of all kinds erected or in process of erection, goods, wares and merchandise, machinery, mills, factories, smelters, foundries, machine shops, breweries and personal property of every description, whether in store, transit or use, from loss or damage by fire, and generally do and transact all business necessary to effectually secure indemnity from loss or casualty by fire or lightning, and all other business transacted by fire insurance companies.   To borrow and loan money, take mortgages, trust deeds or other securities, and to pledge the property and franchise of the company, both real and personal, to acquire by purchase, leases, entry, grant, devise, or gift or otherwise, real estate or other property, and to dispose of said property at pleasure, and to perform any and all lawful acts which the directors or stockholders may deem necessary for the successful prosecution of the business of the company."

Appellee demurred to this second defense.   The demurrer was sustained, and the appellant electing to stand by the answer, the damages were assessed by a jury, who

returned a verdict for $1,265.50, and judgment therefor was thereupon rendered by the court. The errors assigned go to the sustaining of the said demurrer and the judgment rendered.

The authorities cited on both sides of the case are very numerous. Questions touching the *ultra vires* of corporations have been before the courts of probably every state in some shape, and various phases of the question have been many times considered by the federal courts, while standard text-books are full of research and discussion upon the entire subject. We have examined these authorities with care, but a review of them here would be unnecessary labor, since both the English and American authorities have been collated and discussed fully in many of the leading cases cited by counsel in their briefs filed in the case. In respect to the precise question before us, there is apparently much conflict of opinion in the decisions of the courts, such conflict being in many cases apparent only, but in others squarely antagonistic. It is quite well settled as a general rule that a corporation possesses only such lawful powers as are expressly conferred by its charter, and such as are clearly incidental or impliedly requisite for carrying out the declared objects and purposes of its creation.

On the one hand, it is held by some authorities that acts of a corporation in excess of the powers limited by the foregoing rule are illegal, that any contract made in such excess of lawful authority is void and not enforceable, and that neither party to an action founded thereon is estopped to plead the *ultra vires* of the contract in bar of such action.

On the other hand, it has come to be the settled doctrine of several states that a corporation may be estopped to deny its authority to enter into a contract which has been executed, and from which it has derived the benefit which it thereby sought. There seems to be a growing tendency

to this doctrine in modern decisions in this country and it is also supported by the authority of English cases.

As is said in *Parish v. Wheeler*, 22 N. Y. 494, a leading case upon this subject in the United States: "The executed dealings of corporations must be allowed to stand for and against both parties where the plainest rules of good faith require."

Mr. Waterman, in his late excellent treatise upon the specific performance of contracts, says that it is now settled that a corporation cannot avail itself of the defense of *ultra vires*, when the contract has been in good faith fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract. Sec. 226. So if the other party has had the benefit of a contract fully performed by the corporation, he will not be heard to object that the contract and performance were not within the legitimate powers of the corporation.

In the case before us the contract, as made by the parties, appears to have been fully executed on the part of the appellee, so far as his right of action when brought was affected by it. He had paid a small portion of money on the amount of the premium agreed to be paid and had given a promissory note for the balance. This was all he had agreed to do; all that had been exacted of him by the insurance company, and this he had performed. It matters not that the note had not been paid, for it was not due when his right of action accrued and when he brought his suit.

It is not contended that the payment of the note was a condition precedent to his right of action against the company, since, at the time of bringing the action, the note lacked two months of maturity, and there was nothing to be done or performed by him under the contract. The performance already made by the appellee had been accepted by the appellant company, and, so far as it was

concerned, the execution of the note was the same as a cash payment in full of the amount; the company had the benefit thereof. It is argued on behalf of the appellant that the courts ought in all such cases to sustain the defense of *ultra vires*, here interposed, on the ground of public policy; that the public which confers the corporate powers upon such companies has an interest in the protection of innocent stockholders and creditors of such companies by confining the exercise of corporate powers strictly within their authorized limits, and this is given in the books as the chief reason for the rule of decision in the cases which sustain the defense of *ultra vires*.

That the public has such an interest is quite true, but whether to afford such protection the defense of *ultra vires* is always necessary in such cases is another thing. Stockholders are but one portion of the public; another portion, with equal rights of protection, is that with whom these multiform corporations deal in the daily exercise of their assumed powers. And it seems illogical to assume that the interests of the public would be best subserved by a public policy which will allow a corporation, any more than an individual, to violate the principles of common honesty and claim exemption from the obligation of its contracts by pleading its own wrong-doing. Such policy would rather seem to offer a premium for dishonest dealing.

Besides, both the state which grants these corporate powers, and the stockholders for whose benefit such powers are exercised, have their remedies, the former by interfering to revoke the charter, and the latter by an action to restrain the unauthorized undertakings. While courts are inclined to maintain with vigor the limitations of corporate actions, whenever it is a question of restraining the corporation in advance from passing beyond the boundaries of their charters; they are equally inclined, on the other hand, to enforce against them contracts, though *ultra vires*, of which they have received the benefit. If

the other party proceeds to the performance of the contract, expending his money and labor in the production of values, which the corporation appropriates, such corporation will not be excused on the plea that the contract was beyond its powers. *Bradley v. Ballard,* 55 Ill. 413.

Corporations have the capacity to do wrong, and may overstep the limits placed by the law to their powers, and when they violate their charters in this respect their acts are illegal, but not necessarily void. *Bissell v. Mich. etc. R. R. Co.* 22 N. Y. 258.

The plea of *ultra vires* is not to be understood as an absolute and peremptory defense in all cases of excess of power without regard to other circumstances and considerations. The plea is not to be entertained where its allowance will do great wrong to innocent third persons. *Bissell v. Mich. etc. R. R. Co.* 22 N. Y. 258. Where a certain act is prohibited by statute, its performance is to be held void because such is the legislative will. So where the consideration of a contract is by law illegal, as where the cause of action arises *ex turpe.* But where the act is not wrong *per se,* where the contract is for a lawful purpose in itself, has been entered into with good faith, and fairly executed by the party who seeks to enforce it, we must assent to the doctrine of those authorities which hold that the excess of the corporate powers of the contracting party which has received the benefit of the contract is an unconscionable defense, which may not be set up to exempt from liability the party so pleading it. And such, we think, is the case before us.

The answer of the insurance company does not deny the averment in the complaint that the company "was doing business in Larimer county, in the state of Colorado, as a general fire and hail insurance company." It does not deny that it entered into the contract of insurance with the appellee in manner and form as alleged in said complaint, nor that the contract was executed as averred. The sole defense upon which the appellant

company relies here is its want of authority to insure against hail. By offering to insure the property of appellee against damage by hail, and by entering into the contract of insurance therefor, it claimed to possess the power so to do. It took the appellee's money and assumed the risk and obligation of paying the damage, much or little, that might occur, or of having nothing at all to pay, if the contingency of damage should not happen within the time covered by the policy.

A loss having occurred, the company seeks exemption from the obligation it entered into by denying that it had any authority to do what it asserted the right to do when it voluntarily assumed the undertaking.

We are aware that the courts have been very slow to concede that a defendant setting up as a defense the *ultra vires* of a contract, where said contract was clearly not authorized, should be held liable on the contract, since this would appear to sustain the enforcement of an unauthorized contract, and therefore the cases show that whenever the courts could avoid this seeming inconsistency by resting the recovery upon some other ground they have done so. This has often led to equal inconsistency in other directions. The true ground would seem to be that of equitable estoppel, whereby the defendant is not permitted to rely upon or show the invalidity of the contract. In such case, the contract is assumed by the court to be valid, the party seeking to avoid it not being permitted to attack its character in this respect.

The point was strongly insisted upon by counsel for appellant in argument, that one dealing with a corporation is bound to know the extent of its powers to contract, that the corporate name itself indicates the scope of its business, and the record of its charter or articles of incorporation furnishes notice of the extent and limitation of its corporate powers and authority to contract.

While as a general proposition this is true, yet it must be conceded that this constructive notice is of a very

vague and shadowy character. Every one may have access to the statutes of the states affecting companies incorporated thereunder, and to their articles of incorporation, but to impute a knowledge of the probable construction the courts would put upon these statutes and articles of incorporation to determine questions raised upon a given contract proposed, is carrying the doctrine of notice to an extent which can only be denominated preposterous. It was in answer to the same point that Chief Justice Comstock observed, in his opinion in a leading case upon this question, that "a traveler from New York to Mississippi can hardly be required to furnish himself with the charters of all the railroads on his route, or to study a treatise on the law of corporations." *Bissell v. M. S. & N. J. R. R. Co.* 22 N. Y. 258. It was urged in argument on behalf of appellant that the state, which created these corporations for public good, has such an interest in their existence and perpetuity that public policy should be interposed to keep them within the legitimate exercise of their powers. This may be true to a certain extent, and the state may interpose to revoke their charters for an abuse thereof; but we take it that it is no more the public policy of the state to protect the business of private corporations than that of its individual citizens; and to invoke public policy in a case like the one at bar, in order to prevent a corporation from doing wrong, by punishing the other party, would differ little from asking a court, on the ground of public policy, to prevent the obtaining money or goods through false pretenses by holding that the party defrauded should be punished by the loss of his money or goods.

While such wrong may be prevented by interference on the part of the state, or stockholders of the company, it cannot well be said that to cure the evil it is necessary in every case to exempt the company from the liability of its unauthorized engagements.

The principle of estoppel by conduct is the same prin-

ciple which is applied by courts in holding that the statute of frauds, by which, under the general rule, a contract would be void, is never to be used for the protection of a fraud.

The essential elements of an estoppel by conduct are laid down by this court, in *Griffith v. Wright*, 6 Colo. 248, to be that: 1. There must have been a representation or concealment of material facts. 2. The representations must have been made with knowledge of the facts, unless the party representing was bound to know them, or that ignorance thereof was the result of gross negligence. 3. The party to whom it was made must have been ignorant of the truth of the matter. 4. It must have been made with the intention that the other party should act upon it; but gross and culpable negligence on the part of the party sought to be estopped, the effect of which is to make a fraud on the party setting up the estoppel, supplies the place of intent. 5. The other party must have been induced to act upon it. The case before us seems to be fairly brought within the foregoing rules and definitions. The insurance company, through its agent, not only concealed the want of authority to insure against hail, which it now sets up, but, its open notorious acts in soliciting policies of this character throughout the country impliedly held out and represented its authority for such business.

Such agent was certainly bound to know the extent of the authority of the company he represented, and if his acts in the premises were not done with full knowledge of the facts, his ignorance in this respect was gross and culpable negligence.

That the appellee was ignorant of the truth of the matter of want of authority in the company is not denied by the appellant company, except by an inference which, it is argued, is to be drawn that the articles of incorporation and the record thereof furnished constructive notice of the extent of authority of said company. But it seems

to us that such an inference is rebutted by the presumption fairly arising from the nature of the transaction, that the appellee would not have paid his money for the performance of a promise which he knew was void; that its performance could not be enforced, and that his money would be utterly thrown away.

That the offer of the appellant to insure, and the representations made to induce the appellee to enter into the contract of insurance, were made with the intent that the appellee should act thereon, is self-evident from the nature of the transaction, and the acceptance by the appellee of the offer so made by the appellant; and that the appellee was induced to act upon the offer and representations so made is equally apparent, for the act was an obvious sequence of the inducement.

It was strenuously contended by counsel for appellant in the oral argument of this case that whether the contract in a case of this kind is executed or not is immaterial; that the true grounds of liability depend upon, and should be placed upon, the fact of whether the elements of estoppel exist; whether the conduct of one party has been such as that the other party would be defrauded or injured thereby unless the contract should be enforced.

However this may be in respect to the other cases, or as a general rule, we are quite willing to assent to this view in the particular case before us, and to rest our decision upon the ground of estoppel by the conduct of the appellant company.

We do not say that the directors or acting officers of such company may act in excess of their legitimate powers against the interests and contrary to the will of the stockholders of such company, but while admitting the excess of proper authority, we think, on principle and the weight of modern decisions, that if the stockholders, whose business it is to see that their own managing officers act within the proper scope of their powers,

either expressly, or by silence impliedly, assent to acts done on their behalf in excess of authority, they should be held estopped to deny that such acts were authorized.

The appellant company here offered to pay back the money and return or cancel the note given for the policy, and counsel urgently contended that this is all that legally can or rightfully ought to be exacted. This would not place the appellee *in statu quo.* · Every insurance company would be ready and willing to do that much after the loss had occurred, on condition of exemption from payment of the loss. The damage to appellee is the loss of his crops against which the appellant undertook to secure him. After the loss it was too late for appellee to insure in another company having unquestioned authority to insure against such loss.

We therefore conclude that since the contract of insurance, though it may have been beyond the scope of the proper object and purposes of the company as expressed and conferred by their articles of incorporation, was neither by statute nor by their charter expressly forbidden, nor in its nature illegal or improper, and since the conduct of the company in soliciting the insurance and entering into the contract therefor under the circumstances disclosed by this case was such that to exempt it from its engagements thereunder would result in injuring and defrauding the appellee, who in good faith dealt with the company under the belief of its rightful authority in the premises, the defense of the appellant company interposed against its liability on the contract is inequitable, unconscionable, and should not be allowed.

It is admitted that a contract is not enforceable when prohibited by statute; when not so prohibited, however, and when not illegal or immoral in its nature, nor contrary to sound public policy, a contract, even *ultra vires,* may be enforced, when, under the circumstances of its execution, every consideration of justice requires it. This

is the ground of decision in most of the cases relied upon by the appellee in the case.

As is said by the supreme court of the United States in the case of *Zabriskie v. Cl., Col. & Cin. R. R. Co. et al.* 23 How. 400: "A corporation, quite as much as an individual, is held to a careful adherence to truth in their dealings with mankind, and cannot, by their representations or silence, involve others in onerous engagements, and then defeat the calculations and claim their own conduct has superinduced."

Among the many authorities examined in support of our views in this case, we cite the following: *Parish v. Wheeler*, 22 N. Y. 503; *Bissell v. M. S. etc. R. R. Co.* id. 258; *Bradley v. Ballard*, 55 Ill. 413; *Whitney Arms Co. v. Barlow*, 63 N. Y. 69; *Darst v. Gale*, 83 Ill. 141; *State B'd of Agr. v. Citizens' Street R'y Co.* 47 Ind. 407; *Oil Cr. etc. R. R. Co. v. Pa. Trans. Co.* 83 Pa. St. 166; *Argenti v. City of San Francisco*, 16 Cal. 255; *State of Ind. v. Woram*, 6 Hill, 37; *Converse v. Norwich & N. Y. Trans. Co.* 33 Conn. 180, modifying the doctrine in the case of *Hood v. N. Y. & N. H. R. R. Co.* 22 Conn. 502; *Chicago Build. Soc. v. Crowell*, 65 Ill. 453; *Ward v. Johnson et al.* 95 Ill. 215–240; *Zabriskie v. Cl., Col. & Cin. R. R. Co. et al.* 23 How. 398–401; *Hitchcock v. Galveston*, 96 U. S. 341–351; *Nat. Bank v. Matthews*, 98 id. 621; *Manville v. Belden M. Co.* (McCrary, J. U. S. Cir. Ct.) 3 Col. Law, 558; Green's Brice's Ultra Vires, 371, and cases cited; Sedgwick's Stat. and Const. L. 90; Waterman's Specific Perf. Cont., cited *supra*.

The judgment of the court below is affirmed.

*Affirmed.*

BECK, C. J., and HELM, J., concurring. Private corporations are creatures of statute, and derive their powers solely therefrom. Upon weighty considerations of public policy, and of private equity as well, the principle has been universally recognized that the charters or general

laws through which these corporations derive their existence absolutely control their action; that a contract made or an act done by them which is not in any manner authorized by some express provision of the charter or law of incorporation, or which may not be clearly implied therefrom, is *ultra vires;* and that such usurpation of power may be relied upon as a complete defense to a suit growing out of the unauthorized act or contract.

But, for the purpose of avoiding the infliction of manifest injustice in given cases, many courts of the highest respectability have seen fit to recognize an exception to the foregoing doctrine. This exception, when admitted, is always based upon principles largely analogous to those supporting equitable estoppels. The decisions recognizing it hold that where a corporation receives and retains the full benefit of a contract, and a failure to perform on its side would result in palpable injustice to the other contracting party, it is estopped from escaping liability thereunder through a plea of *ultra vires.*

We are inclined to the opinion that cases sometimes arise wherein this exception, properly understood and limited, should be held applicable. If a private corporation has accepted and retained the full benefits of a contract which it had no power to make, the same having been performed by the other party thereto; and if the transaction is of such a nature that the party thus performing will suffer manifest injustice and hardship unless permitted to maintain his action directly upon the contract, no other adequate relief being at his command, we think the defense of *ultra vires* may be disallowed. This, however, does not do away with the objectionable character of the unauthorized contract. It admits the legal wrong committed by the usurpation of power, but denies the equitable right of the corporation to profit through such wrong at the expense of parties contracting with it; the corporation, having received and retained the benefit of the contract, is denied the privilege of invoking

the illegality of its act, and thus avoiding consequences naturally flowing therefrom.

The circumstances attending and surrounding the transaction now before us, in our judgment, render this an appropriate case for the application of the foregoing equitable doctrine. For this reason we concur in the conclusion arrived at by Mr. Justice Stone, who writes the principal opinion.

*Affirmed.*